OPINION OF THE COURT
Barbara Howe, S.
Decedent died on November 28, 2013. He had been divorced from Ursula Sugg (hereinafter Ursula) in 2002, and did not remarry, and he was survived by three sisters, Audrey, Janet, and Sharon. Decedent’s April 17, 2003 will leaves his entire estate to Janet, it nominates her as executrix, and on January 10, 2014, letters testamentary were issued to her.
On September 18, 2014, Janet filed a petition pursuant to SCPA 2103 to compel Ursula to turn over to the estate 60% of the death benefits which she had received as the designated beneficiary of a policy of insurance on decedent’s life.[1] On November 20, 2014, Ursula filed a combined answer and motion to dismiss the petition, contending that she was entitled to the entire death benefits and seeking accelerated judgment.
Janet responded to Ursula’s application, asserting that, pursuant to EPTL 5-1.4, Ursula’s entitlement to the policy proceeds terminated upon her divorce from decedent. Janet seeks a direction now compelling Ursula to pay the entire death benefits to the estate, which Ursula opposes.
Because there is no dispute between the parties in this turnover proceeding that Ursula is in possession of an asset— life insurance policy proceeds — which the estate contends it, not Ursula, is entitled to, the matter has been tendered to this court as involving only an issue of law.
(A)
(i)
Ursula and decedent and were married on March 9, 1968. Thirty-three years later, on September 12, 2001, in a divorce proceeding, they entered into a settlement stipulation in which all of their liquid assets were to be distributed by a 60/40 *457 formula, with decedent receiving 60% of those assets and Ursula receiving 40%. Included in those assets was a life insurance/annuity policy identified in the agreement as “Prudential Account Number [x]” (hereafter the policy).
On April 12, 2002, Erie County Supreme Court granted a judgment of divorce to Ursula against decedent, incorporating into it the 2001 settlement agreement. On July 25, 2003, Supreme Court granted a “Domestic Relations Order — Rollover (Prudential Account Number [x], Now [y]),” directing a 40% distribution of the policy to Ursula.
At some point thereafter, Prudential informed decedent and Ursula that they could not split the policy as directed because it was a life insurance annuity. To resolve this problem, on August 17, 2004, Supreme Court issued an order — referred to as the third order — pertaining to the policy and entitling Ursula to $47,289.60, or 40% of the policy’s value at the time. However, because Ursula owed decedent $39,024.69 under an earlier divorce order, the third order provided that Ursula’s 40% policy share was to be reduced and netted out so that decedent only had to pay Ursula $7,928.96. In effect, the third order directed a net cash buyout by decedent of Ursula’s equitable/matrimonial share of the policy. The third order then provided:
“Upon the effectuation of this Order the entire balance remaining in [decedent’s] Prudential Account [x] shall be his sole and separate property and [Ursula] will cooperate with any requirements to remove her name from the account, if required. The entire balance remaining in Prudential Account [x] shall not be subject to the provisions of the prior Orders granted by this Court on or about March 2, 2001 enjoining the parties from withdrawing from this account subject to the further Orders of this court which prior Order granted March 2, 2001 shall extinguish upon the receipt of this Order by the Administrators of the said account.
“Upon the effectuation of this Order [decedent] may remove [Ursula] as the beneficiary on the Prudential Annuity contract (No. [y])” (emphasis added).
There were no further orders pertaining to the policy, and, at the time of decedent’s death, Ursula was still designated as the policy beneficiary. Ursula applied for the death benefits under the policy, and Prudential paid them to her.
*458 (ii)
The issue before this court is whether a former spouse’s predivorce beneficiary designation on a life insurance policy is revoked under EPTL 5-1.4 when a post-divorce court order specifically points out the right of the policy owner/spouse to remove his former spouse as beneficiary but he does not do so.
Insofar as relevant here, EPTL 5-1.4 (a) (1) provides that
“fejxcept as provided by the express terms of a governing instrument, a divorce (including a judicial separation as defined in subparagraph (f)(2)) or annulment of a marriage revokes any revocable (1) disposition or appointment of property made by a divorced individual to, or for the benefit of, the former spouse, including, but not limited to, a disposition or appointment by will, by security registration in beneficiary form (TOD), by beneficiary designation in a life insurance policy or (to the extent permitted by law) in a pension or retirement benefits plan, or by revocable trust, including a bank account in trust form” (emphasis added).
EPTL 5-1.4 (5) defines “governing instrument” to include, but not be limited to, “a will, testamentary instrument . . . insurance policy . . . [or] a court order.”
Janet argues that, as a matter of law, EPTL 5-1.4 revoked Ursula’s right to death benefits as the beneficiary under the policy. She asserts that decedent’s failure to remove Ursula as a beneficiary is of no consequence because EPTL 5-1.4 operates automatically to revoke the designation upon divorce. Janet also asserts that the “governing instrument” in this case is the life insurance policy, and she points out that EPTL 5-1.4 treats such governing instruments as if Ursula had predeceased decedent. So viewed, Janet says that a “deceased” policy beneficiary is, in fact, no beneficiary at all.[2]
Ursula, on the other hand, says that the circumstances are not as clear-cut as Janet suggests. Ursula maintains that the third order, which she contends is the “governing instrument” in this case, explicitly gave decedent the right to retain Ursula as the beneficiary or to change the beneficiary designation. Ursula says that, despite having his right to make a change in the beneficiary designation clearly pointed out to him by the *459 court in a written order, decedent still did not remove her as the beneficiary.
Contending that EPTL 5-1.4 was enacted solely to prevent inadvertent dispositions to former spouses, Ursula urges that there was nothing inadvertent about decedent’s not having changed the policy beneficiary after the third order was issued:
“The Third Order recognized Ms. Sugg as the current beneficiary of the policy.
“The Third Order did not order the removal of Ms. Sugg as the beneficiary of the policy.
“The Third Order explicitly gave the Decedent the right to keep Ms. Sugg as the beneficiary of the policy, or to change the beneficiary designation; thus, the Decedent did not inadvertently fail to change the beneficiary designation . . .
“The underlying intent of Section 5-1.4 is to avoid inadvertent dispositions to a former spouse because of the Decedent’s neglect . . .
“EPTL § 5-1.4 begins ‘[e]xcept as provided by the express terms of a governing instrument . . .’ (See EPTL § 5-1.4 (a) (emphasis added). Included in the definition of a ‘governing instrument’ is a court order. (see EPTL § 5-1.4[f] [5]). The governing instrument in this case, the Third Order, specifically states that the Decedent may remove Ms. Sugg as the beneficiary on the policy. The Decedent consciously opted not to do so; thus, this is not a case of an inadvertent failure or neglect to change the beneficiary designation on the policy. The terms of the Third Order controlled the disposition of the policy subsequent to the divorce” (emphasis added).
OB)
0)
EPTL 5-1.4 was enacted in 1966, and it has been amended from time to time since. The insurance policy provision(s) at issue here were added with the 2008 revisions, and apply even where, as here, the divorce occurred prior to the 2008 statutory changes but decedent died after those changes became effective.
The statutory language is clear and unambiguous, and plainly provides that a divorce revokes any pre-divorce revocable disposition or appointment of property for the benefit of a *460 former spouse. The effect of the statute is automatic. As a general proposition, only where the terms of a governing instrument provide that the benefit is not revoked by a divorce is the statutory “revocation” avoided.[3]
The legislative history of EPTL 5-1.4 supports this conclusion. Margaret Turano, in her Practice Commentary to EPTL 5-1.4, traces the pre-EPTL 5-1.4 case law issues and concerns, and how the 1966 statute was designed to ameliorate them:
“Before the legislature enacted this section in 1966, judges were consistently holding that the termination of a marriage did not revoke gifts to the former spouse in a decedent’s will. . . . Their rationale was that our statute permitting testators to revoke their wills was, by its own terms, exclusive (see EPTL 3-4.1 and its predecessors), and that only the legislature could provide that divorce or annulment of a marriage automatically revoked gifts to the former spouse. The judges also refused to read a bequest to the testator’s ‘wife, Zelda’, as conditioned upon Zelda’s still being the decedent’s wife, holding instead that ‘wife’ was a description, not a condition. See Matter of Sussdorff, 182 Misc. 69, 43 N.Y.S.2d 760 (Surrogate’s Court, Queens County 1943). Some judges, however, interpreted ‘widow’ as a condition, holding that only a surviving spouse could take the bequests. Matter of Tuck, 165 Misc. 346, 300 N.Y.S. 1132 (Surrogate’s Court, New York County 1937), affirmed, 256 A.D. 971, 11 N.Y.S.2d 226 (1st Dep’t 1939), affirmed, 281 N.Y. 697, 23 N.E.2d 535 (1939); Matter of Wainwright, 82 N.Y.S.2d 345 (Surrogate’s Court, Westchester County 1948) (gift to ‘wife’ meant the wife at the time he made his will while gift to ‘widow’ meant surviving spouse). The legislature surveyed this confusion, found the notion of a testator’s gifts to an ex-spouse counterintuitive, and enacted this statute, which applied to anyone who died after its enactment on September 1, 1966, no matter when the will was executed or the divorce occurred (subparagraph (b)). The legislature added the date because of the presumption, in the absence of contrary legislative *461 intent, that statutes are intended to apply prospectively only. See, e.g., Matter of Gaffken, 233 N.Y. 688, 135 N.E. 971 (1922); Fifth Report of the Commission on Estates, Leg. Doc. (1966) No. 19 (March 31, 1966) at 453.
“Under this section, unless the will expressly provides otherwise, all dispositions to the former spouse are revoked if the couple divorces or if their marriage is annulled, declared void, or dissolved on the ground of absence (subparagraph (a)). Nominations of the former spouse as executor or trustee (but not guardian), and appointments of property in her favor under a power of appointment, are also revoked. The former spouse is treated as having predeceased the testator, so the disposition passes to the alternative beneficiaries, a 1969 amendment designed to avoid the decedent’s partial intestacy. L.1969, ch. 805, § 1” (Margaret Valentine Turano, Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 17B, EPTL 5-1.4 at 241-242 [emphasis added]).
In its recommendation for the original (1966) enactment of EPTL 5-1.4, the Temporary Commission on Estates wrote:
“[I]t would seem strongly presumable, at least in the case of divorce or annulment, that a testator would no longer wish testamentary benefits conferred upon a former spouse prior to the divorce or annulment to remain effective thereafter . . . On balance, it would seem preferable policy to create a conclusive statutory presumption that provisions in a will for a former spouse are deemed revoked by divorce or annulment. In such case, should the testator wish to retain the provisions in his will for a former spouse, he would be required to take the affirmative step of republishing his will, or executing a new one to evidence that intention” (5th Rep of Temp St Commn on Estates, 1966 NY Legis Doc No. 19 at 782 [emphasis added]).
Following its 1966 enactment, EPTL 5-1.4 was amended in 1969, 1979 and 2005; and, in 2008, it was completely revised. Again, and insofar as relevant here, Margaret Turano explains how and why this occurred:
“The legislature repealed the existing 5-1.4 by L.2008, ch. 173, and enacted a new one in its place. Under the prior statute, when a couple divorced, the *462 divorce automatically revoked dispositions under the will and, more recently, transfers under Article 13-4.1 (securities held in transfer-on-death form). L.2005, ch. 325, § 3. It did not, however, affect the ex-spouse’s rights to in-trust-for bank accounts (Tot-ten Trusts), life insurance policies, lifetime revocable trusts, or joint tenancies with right of survivorship. The statute now terminates the ex-spouse’s interest in all such assets . . .
“The statute readopts several provisions of its predecessor. The ex-spouse is treated as having predeceased the decedent for purposes of her dispositions. If the spouses remarry, the gift is revived if its revocation happened solely because of the divorce. Property held jointly with right of survivorship transforms upon the divorce into a tenancy in common” (Margaret Valentine Turano, 2008 Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 17B, EPTL 5-1.4, 2014 Pocket Part at 66-67 [emphasis added]).
It is true, as Ursula says, that these revocation-by-divorce statutory provisions were enacted, at least in part, to prevent “inadvertent” dispositions to former spouses:
“Revocation-by-divorce statutes adopt the presumption that in the vast majority of cases the testator’s failure to revoke his will subsequent to a divorce is due to neglect...
“[A] person is as likely to neglect to change the beneficiary of a life insurance policy as to neglect to change a will” (Alan S. Wilmit, Applying The Doctrine of Revocation By Divorce To Life Insurance Policies, 73 Cornell L Rev 653, 659, 671-672 [1988] [internal quotation marks omitted]).
As another writer has put it: “Even with ample time to notify the insurance company, divorced spouses procrastinate or neglect their personal financial matters” (Susan N. Gary, Applying Revocation-On-Divorce Statutes To Will Substitutes, 18 Quinnipiac Probate LJ 83, 95 [2004]).
The statute and its legislative history make clear that a decedent must take affirmative measures post-divorce to ensure that a former spouse retains her status as a designated beneficiary on any pre-divorce revocable disposition. Failure to do so post-divorce renders the pre-divorce beneficiary designation ineffective unless the governing instrument expressly provides otherwise.
*463 (ii)
Ursula contends that the third order, issued in 2004 (two years after the parties were divorced), constitutes the “governing instrument” in this case. Janet disagrees and says the policy itself is the “governing instrument.”
Both decedent’s life insurance policy and the third order might qualify as governing instruments under EPTL 5-1.4. However, no matter which document is found to be the governing instrument, the “express terms” exception of the statute has not been met.
That is clearly so as to the policy itself. As to the third order, Ursula argues that decedent’s right to remove her as beneficiary, made explicit in that order, coupled with his failure to exercise that right, evinces his intent to retain her as beneficiary. I do not agree.
The purpose of the third order was to resolve the difficulty that the marital interests in the policy could not be split 60/40 as the parties’ divorce settlement agreement had required. This problem was resolved by having decedent buy out Ursula’s 40% interest, after which, as the third order stated, Ursula no longer had any marital interest in the policy and it became decedent’s sole property.
The third order, which was part of the divorce process itself, recast the marital share interests in the policy previously agreed to by the parties. To that extent, it modified the judgment and the agreement terms.
It is only by speculating about decedent’s failure to change the policy beneficiary after the third order was issued that it could be said that, as Ursula does, decedent “consciously opted” to continue her as the policy beneficiary. And, contrary to Ursula’s argument, it cannot be said, on anything before this court, that “[d]ecedent did not inadvertently fail to change the beneficiary designation.” Decedent’s failure to act after the issuance in 2004 of the third order is insolubly ambiguous, and there is no basis in the record to interpret it one way or another.
I conclude that, pursuant to EPTL 5-1.4, Ursula has no right to any of the policy proceeds, and I hereby direct that, no later than 30 days from the date hereof, Ursula shall pay over to the estate the full amount of the policy proceeds received by her.

. The death benefit was $265,830 as of July 9, 2013.

. Janet also contends that, because the third order entirely eliminated the 60/40 equitable distribution of the policy, the estate is entitled to the entire proceeds of the policy.

. In making this determination, I point out that I consider here only the legal arguments presented by the parties, as informed by the facts and circumstances of this case. Whether the effect of the statute might be avoided in other circumstances is not now before me.