In re Estate of McQuay.

[Cite as In re Estate of McQuay (1975),
44 Ohio App. 2d 74.]

(No. 74AP-390—Decided January 28, 1975.)

*Mr. Timothy D. Gerrity,* administrator of the estate of John C. McQuay, for himself.

*Mr. Paul D. Cassidy,* for Mary F. McQuay.

*Mr. Ted L. Earl,* for Elizabeth Breniser, John Oswald and Mabel Zippel.

*Mr. William Duckworth,* for unknown heirs of John C. McQuay.

Troop, P. J. This is an appeal from an entry of the Court of Common Pleas of Franklin County, division of probate, entered July 22, 1974, ordering a distribution of the assets in the estate of John C. McQuay, pursuant to the statute of descent and distribution. The order followed the affirmation of the report of the general referee made to the court March 19, 1974. After affirming, the court found as follows:

"* * * there was a full settlement of the property rights of John C. McQuay and Mary F. McQuay, which set-

tlement and divorce caused an implied revocation of the Will of John C. McQuay which was executed during their marriage.''

Mary F. McQuay, the divorced spouse of the decedent John C. McQuay, filed a notice of appeal, August 19, 1974, from the judgment of the trial court. A single error was assigned as the basis for the appeal. It reads:

''The trial court erred in its findings of fact and conclusion of law that there was a full property settlement as contemplated in the case of *Younker* v. *Johnson*, 156 Ohio St. 197 * * *.''

This assignment of error raises principally a question of law. The basic facts with which this review is concerned are not disputed, although there may be a possible dispute concerning the relevancy of some of the facts in the light of decision law. Basic facts, undisputed, are that John C. and Mary F. McQuay had been married since November 27, 1944. During the marriage, and before a divorce had been granted, in November 1948, John executed his will containing a provision as follows:

''I give, devise and bequeath all of my estate, real and personal, of every kind and description, wheresoever situate, which I may own or have the right to dispose of at the time of my decease to my wife Mary Theresa, absolutely and in fee simple.''

Differences arose between the husband and wife and twenty-four years after the making of the will, on October 26, 1972, the common pleas court entered a judgment containing an order, as follows:

''It is, therefore, ordered, adjudged and decreed that the plaintiff, Mary F. McQuay, be, and she is hereby awarded a divorce from defendant, John C. McQuay, and that the marriage contract heretofore existing between the parties be dissolved and both parties hereto released from the obligations of the same.''

John C. McQuay died November 13, 1972, seventeen days after the granting of the divorce. The controversy with respect to this appeal, and the action in the trial court, wherein the administrator with the will annexed sought a

declaration of his duties concerning the distribution of the assets of the estate, requires, at least as a beginning point, an examination of the judgment entry of the court of domestic relations ordering a disposition of the property of the parties.

The order is lengthy, but because of its importance in this dispute, it is quoted in full, as follows:

"It is further ordered that the net proceeds of the sale of the real estate owned by the parties and known as 3937 Norbrook Drive, Columbus, Ohio, shall be divided equally between the parties. The net proceeds are to be determined by deducting from the gross sales price the real estate commissions, taxes and other costs incidental to the sale, and the debts owing by the parties at the date of the commencement of this action to F. & R. Lazarus Company in the amount of $472.58 and The Union Department Store in the amount of $66.15.

"It is further ordered that each party hereto shall own and hold, free of any interest of the other, any personal property in their respective possession, except that defendant shall deliver to plaintiff a certain small crucifix purchased from the estate of Josephine Bradley Reed in 1972 and shall deliver to the plaintiff her mink stole.

"It is further ordered that defendant shall continue to own the automobile, title to which is held in his name, free of any interest of the plaintiff.

"It is further ordered that the following deposits of money in the City National Bank and Trust Company of Columbus, Ohio, having the approximate balances on deposit on October 4, 1972, as shown, shall be the sole property of plaintiff, to-wit: Checking account No. 43-0628-5 in the amount of $349.16; Money tree account No. 443-160-116-077 in the amount of $299.66; and savings account No. 52-0794-0 in the amount of $33.24, which shall be used to reimburse plaintiff for court costs advanced and for the payment of the balance owing upon court costs.

"It is further ordered that defendant shall surrender to State Savings Company, 1669 Fishinger Road, Columbus. Ohio, 43221, the certificate of deposit No. 3304, issued by State Savings Company on March 9, 1970, in the prin-

cipal amount of $10,000.00, and shall make any endorse-
ments thereon or execute any instruments necessary to ac-
complish the issuance by State Savings Company of a cer-
tificate of deposit in the amount of $10,000.00 in the names
of plaintiff and defendant as joint tenants with rights of
survivorship and delivery of the same to State Savings
Company, who has agreed to act as custodian for the said
certificate, unless and until such other provisions for its
custody is ordered by this court. Upon the death of either
party, the entire fund represented by said certificate, plus
accrued but unpaid interest, shall immediately become the
sole property of the party surviving. And the custodian
shall forthwith deliver said certificate to the survivor. As
long as both parties hereto are alive, any interest or earn-
ings upon said fund payable by State Savings Company,
shall be paid over to and become the property of the de-
fendant John C. McQuay.

"It is further ordered that neither plaintiff nor de-
fendant shall attempt to withdraw, assign, pledge or in
any way whatever incumber any interest which either may
appear to have in said fund evidenced by the certificate of
deposit to be issued.

"It is further ordered that savings account No. 4-
70782, having an approximate balance on October 4, 1972,
in the amount of $543.50 is hereby awarded to defendant,
free of any interest of plaintiff."

The crucial issue here presented concerns the effect
the decree of divorce has upon the provision in the will of
John C. McQuay, quoted *ante,* leaving his estate to his wife
Mary Theresa. The trial court held that the "settlement
and divorce caused an implied revocation" of the will,
which finding is challenged by the divorced and surviving
spouse of the testator.

Decision law is of particular interest in this review
since R. C. 2107.33, which spells out the specific methods
by which a will may be revoked, also provides:

"This section does not prevent the revocation implied
by law, from subsequent changes in the circumstances of
the testator."

Two classic cases in this area are *Younker* v. *Johnson*

(1954), 160 Ohio St. 409, and *Codner* v. *Caldwell* (1951), 156 Ohio St. 197.

In the former decision, the court recognized and referred to the *Codner* decision and distinguished it, at page 411, saying that the will in *Codner* was not impliedly revoked.

.It reasoned as follows:

"* * * [U]nlike the instant one, [it] was executed prior to the marriage and hence was not based on [a] marriage relationship. In the instant case the lower courts agreed that the decision in the *Codner* case is not decisive here."

To expand the fact pattern of *Codner* might provide a contrast with resultant enlightenment. The facts stressed in the syllabus to *Codner* indicate a testamentary disposition, by a codicil, of the entire estate of the testatrix to a beneficiary which she married more than a year later. There was no mention of a prospective marital relationship in the codicil as the reason for its inclusion. There was a written property settlement followed by the divorce, and no reference appeared in the contract as to a testamentary disposition of the property. Additionally, the testatrix lived for several months after the divorce with no change in her will or otherwise expressly revoking the bequest.

*Younker* follows *Codner* and it provides the classic rule. The Supreme Court indicated its awareness of the provisions in R. C. 2107.33, as noted, in paragraph one of the syllabus. Paragraphs two and three are pertinent also. They read as follows:

"2. In that statute it is provided also that nothing therein contained shall prevent the revocation implied by law from subsequent changes in the conditions or circumstances of the testator.

"3. Under the circumstances of a divorce decree coupled with a full settlement of property rights, a court is warranted in finding that there is, as to legacies and devises to the divorced spouse, an implied revocation of a will executed during the marriage."

The suggestion of paragraph three is as to necessary factors—"circumstances" attending the divorce coupled

with "a full settlement of property rights." It must be emphasized that *Younker* says nothing whatever, in the syllabus or in the body of the decision, about the necessity of a written property settlement agreement as a necessary precedent to an "implied revocation." The Supreme Court in *Younker* notes that in its decree the trial court held that the parties had arrived at an amicable division of their property, which was found to be fair and equitable and therefore confirmed.

The question then is, were there, in the instant case, any "circumstances" and was there a full settlement of the property owned by the parties to the action. A compelling circumstance seems to have motivated the action for a divorce filed by Mary Theresa McQuay. In addition to a description of increasing infirmities, of both parties, especially John, Mrs. McQuay describes the "circumstances," as follows:

"Well, it was really for a matter of survival. Our divorce was entirely different from the average one. I mean, there was nothing like anyone else coming into the— I mean no women or men, thank God, into the picture. It was merely we could not take care of each other. I could not help him any longer and he could not help me."

Several facts bear upon the question of a "full settlement." Unlike *Younker* the trial court did not "find" that the parties had arrived at an amicable division of their property, but the trial court did recite in its decree the careful detail of the division set out *ante*. If nothing more, the court impliedly found the division fair and equitable, or it would not have been included in the court's order.

That there was a "full settlement of property rights" is evidenced by the testimony of Mary McQuay herself. On direct examination, she was asked:

"And what were you hoping to achieve as a result of being in court that day, scheduled to appear at this trial before Judge Hill?"

The reply was: "It was to achieve a divorce so that we could make a settlement."

Her testimony indicates that there were, at least,

negotiations concerning a property division at the time of trial. On cross-examination, the witness was asked:

"Alright. And was not the discussion you had at the court that day with respect to what was going to be done with the property that the two of you owned?"

The response was: "Well, I think so. I had already made that statement prior to that time."

There is also evidence to support the contention that there was an agreement and that such was reduced to memorandum form. A copy was furnished to the referee. There is evidence also that the property settlement was before the court. A series of questions and answers so indicate.

"And following the review of the handwritten memorandum, which was signed by yourself and by John, you appeared before Judge Hill, did you not?"

The response was "Correct."

That there was a "full settlement" is also supported by the testimony offered by Mary McQuay. On direct examination she was asked:

"Now, the property which you and John owned or held title to at that time was substantially the property set forth in the decree of divorce. Is that correct?"

The response was "Yes." That same question, in essentially similar language, was reiterated and the response was exactly the same.

An interesting annotation discussing the effect of divorce upon previously executed wills by a husband and wife is found in 18 A. L. R. 2d 697. Included is a summary of the evidence required to rebut the implied revocation, one of which is the time factor. Waiting a long time to correct the existing will is held in some states to be sufficient. In the instant case John McQuay died seventeen days after the divorce was granted, during which time he was ill and could hardly be expected to have changed his will. Perhaps this is a portion of the circumstances which need to be noted.

A related concern in these situations is the "intent" of the testator at the time the will is made, against the

time at which the marriage was dissolved. The Supreme Court in its *Younker* decision, at page 412, seems to have thought intent to be a necessary concern. The court quotes at length from *Will of Battis* (1910), 143 Wis. 234. A portion of that quoted matter reads as follows:

"The decree divorcing them and awarding a final division and distribution of his estate makes them strangers to each other, and the bestowal on her of such a portion of his estate as he ought in justice and right under the conditions and circumstances to bestow on her operates to discharge all his moral and legal duties toward her. It was upon such considerations that courts acted in establishing the doctrine of implied revocation of wills. The changed condition and circumstances of a testator thus brought about are of a nature and, in effect, of such probative force as to imply that the testator intended that the testamentary provisions heretofore made for the wife should become revoked thereby."

There is sufficient evidence for the trial court, after weighing and determining credibility, to have concluded that there were persuasive circumstances coupled with a full settlement of property rights, sufficient to have found an implied revocation of the will of John C. McQuay.

For the reasons advanced, the assignment of error is found not to be well taken.

*Judgment affirmed.*

HOLMES and WHITESIDE, JJ., concur.